IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

DONNA S. BLEVINS                                                                    PLAINTIFF

           v.                      Civil No. 08-3066

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                      DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Donna Blevins, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## Procedural Background

The plaintiff filed her applications for DIB and SSI on January 11, 2005, alleging an onset date of September 14, 2004, due to chronic pain in her right shoulder, hip, neck, and lower back, headaches, and depression. (Tr. 24, 33, 72-73, 92, 108-109, 119-120, 247, 357). Her applications were initially denied and that denial was upheld upon reconsideration. (Tr. 24-29, 349-352). Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ). An administrative hearing was held on February 26, 2008. (Tr. 353-355). Plaintiff was present and represented by counsel.

At the time of the administrative hearing, plaintiff was 39 years of age and possessed an eighth grade education. (Tr. 33, 373 ). She had past relevant work experience as a certified nursing assistant, prep cook, waitress, and casting house worker. (Tr. 100-103, 367, 372-373).

On July 25, 2008, the ALJ found that plaintiff's osteoarthritis and mood disorder were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 13). After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to perform medium work. However, from a mental standpoint, plaintiff was limited to performing routine work with superficial contact with public and co-workers incidental to the work performed and work involving non-complex, simple instructions learned by rote with few variables, requiring little judgment, and involving concrete and direct supervision. (Tr. 13-14). With the assistance of a vocational expert, the ALJ found plaintiff could perform work her PRW as a casting house worker. (Tr. 17).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on October 24, 2008. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 7, 8).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be

2

affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

**Discussion**

In the present case, the records reveals that plaintiff suffered from mental impairments impacting her ability to perform work-related activities. Plaintiff underwent three separate psychological evaluations to assess her level of mental impairment. The ALJ, however, did not consider and weigh each of these assessments as is required by the regulations.

3

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

On April 16, 2006, plaintiff underwent a mental status examination and evaluation with Dr. Stephen Harris. (Tr. 206-210). Plaintiff indicated that she was applying for disability because she was nervous around people and found it hard to talk to others. She relayed her fall history to Dr. Harris, indicating that she had fallen in 2004, chipping a bone in her shoulder at the rotator cuff and resulting in hairline fractures in her neck. Plaintiff became tearful as she described her physical impairments. She reported a major headache in the top of her head, sometimes at the back of her skull near her neck. Plaintiff also stated that her right shoulder and arm hurt all the time. She rated her pain as a six on a ten-point scale, stating that she had no

4

money or insurance to go back to the doctor and had been dropped from Workman's Compensation benefits after only three weeks of treatment. (Tr. 206-210)

Plaintiff attended school through the ninth grade in special education classes and then married at age sixteen. (Tr. 206-210). She reported two failed marriages with a history of domestic violence. In fact, she stated that her first husband had practically beaten her oldest son of her womb when she was five months pregnant. That child lived for three years and died after receiving a blood transfusion infected with Hepatitis C. Plaintiff indicated that she could take care of her own personal needs, but not on a daily basis. She stated that she tried not to drive because it "scare[d] [her] to death." Plaintiff could find her way on familiar routes, but experienced difficulty on unfamiliar ones. She reportedly did her own shopping and a friend helped her with household chores. (Tr. 206-210).

Dr. Harris noted that plaintiff was fearful, anxious, and tearful throughout the evaluation. (Tr. 206-210). She seemed to be somewhat inhibited, but well organized under direct questioning. When asked about hallucinations and delusions, plaintiff stated that she sometimes heard a radio while in bed and felt that everyone was out to get everyone else. Her affect and mood appeared to be tearful and depressed. She had a low self-concept, reporting that her interests were in sleeping and caring for her puppies. Plaintiff reported chronic fatigue and stated that it was not uncommon for her not to get out of bed. Although she denied suicidal or homicidal ideations, plaintiff indicated that she was hospitalized once for an overdose attempt. Dr. Harris estimated her IQ to be 80 or higher and diagnosed plaintiff with post traumatic stress disorder, agoraphobia, depressive disorder not otherwise specified, and pain disorder associated with both psychological factors and general medical condition. He also assessed her with a

5

global assessment of functioning score of 54 and indicated that her prognosis was guarded. Her adaptive functioning also appeared to be lower than her intellectual ability. Dr. Harris noted that plaintiff could be understood and could communicate effectively, but was quite guarded. She seemed to avoid contact with others and showed signs of withdrawal. Plaintiff also exhibited some difficulties with persistence and pace but not with concentration. (Tr. 206-210).

On July 12, 2006, plaintiff underwent a mental status exam and evaluation of adaptive functioning with Dr. Robert Hudson. (Tr. 211-214). Plaintiff saw her case as being mainly based on the physical injuries she sustained in her fall, but Dr. Hudson noted that she clearly had significant mental/emotional factors. Plaintiff was anxious, depressed, and reported problems being around strangers. Dr. Hudson indicated that the appointment was very difficult for her, even though there was very little traffic in the building. She remained anxious for the entire one hour consultation and even when her anxiety was acknowledged by plaintiff and the examiner, this did not seem to help. Plaintiff sat in a rigid posture and moved her feet and legs constantly. She was pleasant and smiled, but did not laugh. Plaintiff was anything but relaxed. And, when excused, plaintiff almost bolted out the door and was into her car and gone within a matter of seconds. (Tr. 211-214).

Plaintiff reported a history of attention deficit hyperactivity disorder diagnosed at age six that was treated via Ritalin from grades two through six. (Tr. 211-214). Aside from this, her childhood was unremarkable. Plaintiff reportedly dropped out of school in the tenth grade and a history of two unsuccessful abusive marriages. At the time of her appointment, plaintiff stated that she lived in an apartment with her brother and was helping the manager to pay her rent. (Tr. 211-214). Plaintiff indicated that she had been treated by a counselor in Springdale on one

6

occasion. Unfortunately that counselor had recently been placed on medical leave and would not be available for another appointment for several weeks.

Plaintiff was fairly spontaneous without pressure of speech. (Tr. 211-214). Her thought content was generally logical and goal directed. Plaintiff's affect was basically agitated and dysthymic with a probable labile mood. She cried frequently and acknowledged daily suicidal thoughts, but denied a plan. Dr. Hudson considered her only a fair respondent for history. She denied unusual powers, but was obsessed with not being in public. Someone had been taking her shopping at three in the morning so that she did not have to deal with many people. (Tr. 211-214).

Dr. Hudson could find no real indication of a thought disorder, although she did somewhat obsessively cut and burn herself. He noted that she had somewhat directed this into a positive vein by giving herself tattoos. She stated that the pain of this helped put an end to her psychological distress when distress was at its peak. Plaintiff also reported getting angry easily and taking her anger out on objects. Dr. Hudson concluded plaintiff was in need of psychiatric intervention. Because plaintiff indicated that she was considering a move back to Harrison, Dr. Hudson believed that she would likely be comfortable for a time and would not seek treatment again until her condition further deteriorated. Therefore, he concluded that her prognosis for the next twelve months was poor, regardless of the possibilities for improvement with adequate treatment. Plaintiff's concentration, persistence, and pace were on the lower end of normal. She was not mentally retarded or borderline intellectually, but Dr. Hudson did not believe her intellectual abilities were much beyond borderline intellectual functioning. (Tr. 211-214).

On May 7, 2008, plaintiff underwent a neuropsychological evaluation with Dr. Vann Smith. (Tr. 337-346). Plaintiff described her overall health status as poor, reporting a history of probable diabetes, degenerative disk disease of her cervical spine, multiple closed head injuries with Grade II and III concussions, right rotator cuff and left hip trauma secondary to a slip and fall at her place of employment, and migraine headaches (average three per week). She described chronic, almost constant, multifocal pain which she rated as a six to a nine on a ten point scale. To her knowledge, plaintiff had never been referred to a physiatrist or similar pain management specialist and was taking no prescription medications. Plaintiff reported a positive history for outpatient psychiatric attention due to bipolar disorder and depression. A neurocognitive status exam revealed an adequately nourished, casually groomed, distractable, anxious, and cooperative female with a muted and shallow affect, a mildly anxious and dysthymic mood, and a mildly impaired memory. Her native intelligence was estimated to lie within the normal range, her thought processes were functional to concrete in quality, and her judgment and insight were grossly intact. Plaintiff reported recurrent olfactory hallucinations and occasional and incomplete auditory hallucinations. Her narratives were marginally fluent with audiblized word finding pauses, noted, but without evidence of clear associational anomaly. No suicidal or homicidal ideations were reported. Dr. Smith diagnosed plaintiff with cognitive dysfunction secondary to her general medical condition and a mood disorder secondary to her general medical condition. He stated that her examination and screening test profile data revealed a pattern of abnormal responses and pathgnomonic indices consistent with the presence of impaired brain function of moderate severity. This pattern of abnormal findings was similar to that seen commonly in association with traumatic brain insult and the sequelae thereof;

8

hypoxic, toxic, cerebrovascular or metabolic encephalopathies; and, the dysregulation of key central neurochemistry believed to be precipitated by the brain and the spinal cord's adaptive response to chronically painful disease process. Dr. Smith then noted that these data were, to a significant degree of scientific certainty, consistent with plaintiff's reported clinical history.

Dr. Van Smith also completed a mental RFC assessment. (Tr. 342-346). He assessed plaintiff with a global assessment of functioning score of 30 and found her prognosis to be guarded. Dr. Smith found that plaintiff was unable to meet competitive standards in the following areas: remembering work-like procedures; maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; understanding, remembering, and carrying out detailed instructions; setting realistic goals or making plans independent of others; and, dealing with the stress of semiskilled and skilled work. He also concluded that plaintiff was seriously limited but not precluded in the following areas: understanding, remembering, and carrying out very short and simple instructions; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; being aware of normal hazards and taking appropriate precautions; interacting appropriately with the general public;

9

maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places; and, using public transportation. (Tr. 342-346). Dr. Smith noted that plaintiff had an IQ of only 89. He also stated that her chronic, poorly controlled non-psychogenic pain was a significant etiologic factor, and that her impairment or treatment would cause her to miss more than four days of work per month. (Tr. 342-346).

In spite of three evaluations indicating that plaintiff experienced great difficulty being around others and at least one diagnosis of agoraphobia, the ALJ utilized the RFC assessment of a non-examining, consultative psychologist and concluded that plaintiff was merely limited to performing routine work involving superficial contact with the public and co-workers and work involving non-complex, simple instructions learned by rote with few variables, requiring little judgment, and involving concrete and direct supervision. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). We note that the one RFC assessment from a psychologist who actually evaluated plaintiff concluded that she was seriously limited with regard to working in coordination with or proximity to others without being unduly distracted, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, interacting appropriately with the general public, and maintaining socially appropriate behavior. Further, evidence reveals that plaintiff did her shopping at three in the morning to avoid crowds and was so anxious during her examination with Dr. Hudson that she practically bolted from the door when the examination concluded. It seems clear to the undersigned that plaintiff had some significant issues dealing with others. As

10

such, we believe that remand is necessary to allow the ALJ to reevaluate the evidence concerning plaintiff's mental impairments.

The ALJ dismissed Dr. Smith's evaluation stating that it was suspect because it was paid for by plaintiff's counsel after the administrative hearing. While this evaluation was paid for by plaintiff's counsel, the record indicates that, during the administrative hearing, counsel requested that the ALJ order an updated consultative examination of plaintiff.[1] At that time, the most recent evaluation was two years old. When the ALJ failed to order an evaluation, counsel sent plaintiff to Dr. Smith for an evaluation. As such, we believe that Dr. Smith's evaluation was entitled to consideration and at least some weight. Accordingly, remand is necessary to allow the ALJ to reevaluate Dr. Smith's RFC assessment. On remand, the ALJ should also attempt to obtain an RFC assessment for at least one other physician who has examined/treated the plaintiff.

Plaintiff also indicated that she had begun seeing a counselor, but the counselor had recently been placed on medical leave and she could not schedule another session until the counselor returned to work. The ALJ dismissed this stating that he found no records in the file to show that plaintiff had ever been treated by a counselor. We note, however, that the ALJ also has a responsibility when it comes to developing the record. In fact, the ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). In

---

[1] The ALJ presumes that medical assessments sought out in connection with a claimant's disability application rather than in an attempt to seek medical treatment are suspect and entitled to less weight. We do not agree. Every consultative examination ordered by the Administration is sought out in connection with an application for disability benefits. It matters not who pays for the evaluation. The weight given an evaluation should be based on whether the evaluation is supported by the overall medical evidence of record.

11

determining whether an ALJ has fully and fairly developed the record the proper inquiry is whether the record contained sufficient evidence for him to make an informed decision. *See Payton v. Shalala*, 25 F.3d 684, 686 (8th Cir. 1994); *Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989). Therefore, we believe the ALJ should have attempted to obtain medical records from plaintiff's counselor before dismissing her report as untrue.

In addition, the record indicates that plaintiff obsessively cut and burned herself when psychologically distressed. Again, we believe the record should have been developed further concerning plaintiff's self mutilating behavior. If proven, this would be a clear indication that plaintiff constituted a danger to her self and was in need of intervention. Accordingly, we believe that the ALJ should have requested records from plaintiff's treating counselor and should have investigated her self mutilating behavior prior to determining her mental limitations. Accordingly, we do not find that sufficient evidence existed for the ALJ to make an informed decision concerning plaintiff's mental RFC.

**Conclusion**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 4th day of March 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)